(No. 20348.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM G. JENKINS, Plaintiff in Error.

*Opinion filed December 18, 1930.*

AMOS P. SCRUGGS, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

William G. Jenkins was convicted in the criminal court of Cook county of an assault with intent to commit rape and was sentenced to imprisonment in the penitentiary on

May 24, 1929. The *mittimus* was stayed by successive orders of the criminal court until January 10, 1930. The defendant sued out a writ of error and the cause was submitted at the October term, 1930.

The only contention of the plaintiff in error is that the evidence does not sustain the verdict and does not show that the assault, if one was committed, was with intent to commit rape.

The prosecuting witness, Catherine Butch, a young woman nineteen years old, lived with her step-father, John Bognan, in the basement of an apartment house at 373 East Fifty-fifth place, in Chicago, where Bognan was employed as janitor. The plaintiff in error had once occupied an apartment at 371 East Fifty-fifth place and the prosecuting witness was acquainted with him. Bognan was a janitor for two other apartment buildings in the immediate neighborhood, one at 368 East Fifty-fifth place and the other at 5526 South parkway. On October 30 Jenkins was living at 357 East Fifty-fifth place, and at 6:00 o'clock that evening about fifteen or twenty members of the executive committee of the American Negro Protective Association met at his place to devise means of sending out 20,000 circular letters in the interest of the candidacy of Judge Swanson for State's attorney. The meeting adjourned before 8:00 o'clock, and some of the participants, including Jenkins, started to a Republican mass meeting to be held at Forty-third street and Michigan avenue. At 373 East Fifty-fifth place the street was well lighted, and in addition to the street lights there was a filling station across the street from No. 373 on which were seventy-five shining electric lights. The station had a shelter for cars being served. Jenkins stopped and went into the basement at 373 East Fifty-fifth place while his companions went to the filling station and waited for a bus to take them to the mass meeting. Jenkins also attended the mass meeting, where he took part as a speaker. The events which formed the basis of the indict-

ment occurred during the time he was separated from his companions.

The testimony of Jenkins and the prosecuting witness are in direct conflict. Catherine testified that she and her father were in the house when Jenkins came, about 8:30. He rang the bell and her father opened the door for him. Jenkins and her father were in the dining room, talking about voting, while she was in the kitchen washing dishes. Jenkins came out in the kitchen and asked for a drink of water. He then said, "Can I have a kiss?" She said "No," and went back to the dining room to her father. Jenkins followed, and her father got up, saying, "I will go and cover my fires." She said, "All right." Jenkins said, "Can I go with you?" Her father said, "No, I don't need anybody." Jenkins then asked, "Can I stay here?" and her father said, "No, you can go home." Jenkins said, "Can I come back if you are here?" and her father said, "No, we are going to bed." They walked out together and Catherine also went out, and when they got out in the street Jenkins walked to the east corner and she and her father were standing out on the street, talking, when Jenkins came back and asked her father for a quarter in change. Her father said he did not have it. Jenkins went back to the corner again to call the bus, and after he went to the bus she told her father all right—he could go and cover his fires. "So soon as my father got in the basement across the street Jenkins came back with his privates exposed. He was walking west and came back to east again, and a colored girl was coming at that time. He said the same thing to her. She ran east for the bus and he ran after her, and then I looked west for the people to come to bring the little boy that I took care of. When I was looking west all of a sudden somebody grabbed me and pulled me down three stairs. At that time he passed me and said, 'Look here, honey, what I got for you.' At the time the defendant grabbed me there was a stairway of five stairs going down

in the basement. There is a cement wall going around the steps there and I was sitting on there when he pulled me down. I caught on the corner of my coat—that's what kept me from falling down from the steps. I was kneeling on the third step going down-stairs. After he seen I was falling he just let me go. I got up then. I seen the lady and man coming with the little boy—that is, Sam and Mrs. Jessie Cognata's. He seen them coming and he walked away to the corner east. They came up to me and Jenkins then started to walk west and stood about fifteen feet away from those people when I was telling them what happened, and this man went over to them. I heard Mr. Cognata say, 'What do you want with this girl?' He said, 'I don't even know her; I don't even live around here; I don't even know what you are talking about.' After that occurred I heard him say 'Oh!' I seen Jenkins raise something out of his pocket, but I don't know what it was because I wasn't so close there. When this happened Jenkins was just about fifty feet away from the steps where I was sitting. I didn't do nothing after that—just tell Mr. Cognata—and he went there and talked to him. Then, of course, Jenkins went away. Jenkins told Mr. Cognata to 'Get back,' whatever he had in his hand, and he got loose and ran away and Mr. Cognata ran after him, but he got on a bus so quick he couldn't get him. Jenkins ran east. After that Mrs. Cognata went to find a policeman, and I was standing there with the little boy on the steps for them to come back. Just then my father came home from covering his fires and I told him what happened."

Catherine was taking care of a child of Sam Cognata and his wife, Jessie, both of whom were working elsewhere. Mrs. Cognata was accustomed to call at Catherine's home for the child about 4:00 o'clock each afternoon and take him home until a quarter of 8:00 o'clock, and had done so on October 30. She and her husband brought the child back to Catherine on October 30 about 8:30, which was

later than usual, to leave it with Catherine for the night. When Mr. and Mrs. Cognata arrived Jenkins was still in the immediate vicinity, standing about fifteen or twenty feet from the basement steps, near an automobile, with his person exposed. As they came up the Cognatas had seen Jenkins coming from the basement steps. Catherine said to Mrs. Cognata, as Mrs. Cognata testified, "Oh, Jessie! Did you see that man? He got hold of me and tried to drag me down the steps and said, 'Look here, girlie, what I got for you,'" and as Cognata testified, she said, "Jessie! Jessie! You see that man over there? He grabbed me and pulled me down in the basement and exposed himself." Cognata stepped in front of Jenkins and asked, "What do you want with this little girl?" Jenkins said, "I don't know her; I don't even live here," and started away. Cognata followed, and Jenkins, with something which shone in the light in his hand as if he had a razor or gun, said, "Stand back." Jenkins then ran north and boarded a bus which was coming along.

Jenkins, Catherine and her step-father agree that Jenkins called at the basement apartment at about 8:00 o'clock that night but not as to the purpose of the call. Bognan, who is an Austro-Hungarian, testified that Jenkins called upon a political mission and stayed for about half an hour. Jenkins testified that he called to pay Bognan a dollar which he owed for some linoleum and remained only three or four minutes and did not see Catherine, though he heard her in the kitchen; that he and Bognan went out together and he went to the filling station and Bognan to his other building, which was also across the street. Bognan testified that during this visit Jenkins went to the kitchen and he heard him talking with Catherine there.

The specific intent charged in the indictment must be proved beyond a reasonable doubt to justify a conviction upon a charge of assault with intent to commit rape. Disregarding entirely the testimony of the plaintiff in error

and his witnesses and giving full credit to the testimony of the prosecuting witness, the facts shown are not sufficient to sustain the verdict. The evidence shows unseemly, insulting and disgraceful conduct on the part of the plaintiff in error and an indecent assault on the prosecuting witness, but it falls short of establishing his intent to have sexual intercourse with her by force against her resistance. The time, the place and the circumstances of the assault, the language used and the acts done must all be considered in determining this question of intent. The plaintiff in error did not use excessive violence in seizing the girl around the waist and pulling her down the three steps, and when he saw her falling he let her go, and, seeing the Cognatas coming, walked away. The place was a public street, brightly lighted, with people likely to pass at any moment. His language, his disordered clothing, the exposure of his person, his seizure of the girl were indicative of his passion but not of an intention to gratify it then and there in spite of her resistance, and his immediate desistance has some tendency to show that he did not intend to proceed to extreme violence if resisted. Proof of an indecent assault, however aggravated, will not warrant a conviction of an assault with intent to commit rape, without proof of the intent to have intercourse with the woman by force and to overcome all resistance. Licentious conduct or violent familiarity with the woman in an effort to induce her to yield will not warrant a conviction where there is not proof of an intention to have carnal knowledge of her by force and against her will. (*People* v. *Cieslak,* 319 Ill. 221.) In this case it is unnecessary to consider the credibility of witnesses or the weight of the evidence. The evidence tending to prove the guilt of the plaintiff in error was insufficient, for want of evidence of the specific intent charged, to sustain the verdict.

The judgment is reversed. *Judgment reversed.*